Okay, it looks like everyone is present. And we will now hear argument in Virtue Global Hldgs v. Rearden with Mr. Michelson and Mr. Lowenfeldt. Yes, Your Honor. Thank you. You may begin whenever you're ready. May it please the Court, I'm John Michelson representing intervener and appellant VGH. I'll reserve three minutes for rebuttal, if I may. You better keep track of your time. Yes, ma'am, I will. And I will address the topic set forth in the Court's April 16th order, which was very much appreciated. First topic in that order is whether Original M02 was or was not a subsidiary of Rearden. And we say, of course, it was not a subsidiary of Rearden. The District Court made no proper finding on that issue. It offered merely a conclusory statement with no reference to the record and no explanation. The only competent evidence that might support the assumption made by the District Court are a few verbal assertions by Mr. Perlman at trial. Contrary to those assertions, there's voluminous documentary evidence that by its nature renders Mr. Perlman's unsubstantiated assertions implausible. Those are for the most part set forth in our briefs. But let me highlight two things. First thing I would call the Court's particular attention to are the act statements and directions of Lawyer Kalin, including his engagement letter, correspondence regarding his engagement letter, his instructions to staff, and his action statements after a controversy arose, all of which are wholly inconsistent with the idea that Original M02 was a subsidiary of Rearden. Is there any evidence in the record... Since there was a bench trial, is our review of this question for clear error? I believe this particular question, yes, is clear error. Okay. And I believe we can surpass that high bar. Okay. I'm sorry, Judge Collins, for stepping on your question. That's all right. Is there any evidence in the record as to whether or not the papering of the creation of M02 differed from how other Rearden entities were papered? In other words, other Rearden entities that were subsidiaries of Rearden, were they papered differently from how M02, or was it essentially the same way in which it was done? There's nothing in the record either way, Judge Collins. So it's a good question, but I don't believe the record will answer it for us. Okay. Because looking at the corporate formation documents, there's no reference to Rearden at all. And I just wondered whether that differed from how it was done with other Rearden entities. You're correct. There was no reference, but I can't answer this specific question based on the record. So the second thing I would just call the court's attention to, really as a highlight of the evidence, which I believe gets us over the clear error hurdle here, is evidence that sometimes what is not said is as or more compelling as to what is said. In late March of 2013, after a dispute had arisen, Rearden sent a demand letter to Mr. LaSalle outlining its position and making a demand on him to turn over LaMova property. That letter is at record excerpts 1409 and 1410. There is nothing in that letter which indicates that Rearden felt that original M02 was a subsidiary. Now that loud omission is echoed later in this case in its contentions to the district court both before and after trial. Rearden never argued that original M02 was a subsidiary based on Mr. Perlman's testimony or anything else. So this is something that was not presented to the court by the parties as a disputed issue, but the court nevertheless made its conclusory statement. Now we think that we, based on what I just said, and what's in the record, we overcome the clear error burden. But if that's not the case, it is a high burden. If it's not the case, that's not dispositive for Rearden. In fact, it may be just the reverse. It may be dispositive against Rearden. As the district court said, and what I have to describe as its unique narrative, quote, the reason Perlman set up original M02 as a new subsidiary of Rearden was to maintain the appearance consistent with his representations to Louder that LaSalle would be taking ownership of MOVA. Those representations, of course, were false representations, part and parcel of, in the court's narrative, Rearden's resulting unclean hands. This case should not be determined based on that sort of unconscionable conduct. That brings me to unclean hands. I'm not going to go directly there because your second question, which I'll move on to, unless you've got further things you want to ask about the subsidiary issue, but let me move on to the issue of the PIIA. Your question with the PIIA is whether it covers LaSalle's acquisition of MOVA. Our position is no, it does not cover LaSalle's acquisition of MOVA. Like any contract, this one has to be interpreted as of the time and with regard to the circumstances under which it was made. The PIIA was entered in August 2012.  Does the record say what date in August the sale on behalf of creditors was completed and it went to OL2? I couldn't find that. I read through all the references and they all say August 2012, but they don't tell us the date, whether it was before or after August 20th. I don't know that the exact date is in the record. Judge Collins, but I think it's a fair inference that the assignment for benefit of creditors took place before the August 20th date. Everyone seems to assume that that's true, but I couldn't find the exact date of that. You're correct and I think it's assumed to be true because by the time that Mr. LaSalle was presented and Mr. Pierce was presented the employment documents by Reardon, they were out of work at OL2. They were at Online, OL2's predecessor. So I think it's a fair assumption, but you're correct. There's no specific date in the record. So you're saying that by virtue of the fact that they had lost employment with OL2 and that was the occasion for having them sign the contract on August 20th, it necessarily occurred after the closure, whatever the date was. That's how I would draw the inference, correct. All right. The second fact and circumstance that's important in interpreting the PIA in our view is that it was entered along with the two other documents, the offer letter and the agreement to arbitrate, without any discussion as to its terms. We therefore have to look within the four corners of all that paperwork prepared by Reardon and not elsewhere to determine meaning. Now there are two parts of what we think is a proper construction that compel the conclusion that the PIA did not cover LaSalle's acquisition of MOVA. The first of those is that we need to take account of the purpose of the PIA as that purpose is stated in paragraph number three of Reardon's contemporaneous offer letter to LaSalle. That purpose, again as stated by Reardon, was one, to protect IP already owned by Reardon and two, to protect IP developed by LaSalle while he was a Reardon employee. MOVA doesn't fit either of these categories. MOVA was owned by OL2, not Reardon, at the time the PII was entered. Chancellor, could I ask you a question about the issue of the factual finding being clearly erroneous, which is what you've been addressing. I did not read your opening brief to challenge the particular finding that original MO2 was a subsidiary of Reardon. Did I miss something in your opening brief? There are a number of other findings that you challenge at pages 54 to 58, but have you waived the argument that we've been discussing that the ownership finding was clearly erroneous? I don't recall offhand whether the subsidiary issue was discussed at any length in the opening brief. It certainly was in the reply. Well, under our cases, raising something for the first time in the reply ordinarily doesn't bring it up for our decision, which is why I'm asking the question about the opening brief. You certainly did point out evidence that in your view supports the opposite conclusion, but I wasn't finding, and I may be incorrect about this, but I wasn't seeing a specific challenge to the finding. Sitting here today, I couldn't refer you to that specific citation. I'm looking at page 50 of your opening brief, and it says, No contemporaneous writing reflects Perlman's post-facto assertions that Original MO2 was Riordan's subsidiary, rather than LaSalle's own company. And then you go on on page 52 or 51. You say, When asked to identify any writing that indicated that Original MO2 was to be formed as a division or subsidiary of Riordan, Perlman identified only the PIAA, and then you go on to say on 52, the PIAA, of course, does not state that Original MO2 is a subsidiary, and is discussed here and did not operate to make Original MO2 a subsidiary. That's all correct. My concern is that the section of the brief that challenges factual findings as unsupported, which begins on page 54, does not list this as one of the findings, or I did not read it to say that. So it definitely sets out, as I said, the other evidence that would support another finding, but I don't see it as a separate argument. And that's what I was asking about. Well, I appreciate, Judge Collins, you're knowing my brief as well, or perhaps better than I do. So I don't have a further response to you, Judge Graber, but I do want to make clear that when we say there's a clear error issue, that is only with respect to the question of whether the district court was correct in characterizing Original MO2 as a subsidiary. I understand that. That's what I was referring to also. But the question of the interpretation of the PIAA, that's a matter de novo for this court. I understand. Very different standard. Thank you. Back to the interpretation, MOVA was not owned by OL2 at the time the PIAA was entered, and LaSalle did not develop MOVA while he was a Reardon employee in 2012 or 2013. MOVA thus doesn't fit in the purpose of the employment agreement, the PIAA. Second, even if you ignore the purpose of the PIAA, the assignment language in that document, drafted by Reardon, doesn't reach MOVA. MOVA was not proprietary information developed, created, or discovered by or on behalf of Reardon during LaSalle's tenure in 2012 and 2013. Nor did it become known during that time. Reardon knew about MOVA years before, and as to the only other operative term in the assignment provision, that proprietary information conveyed to the company had to be assigned, the term conveyed is ambiguous. We've described this in our brief. We believe it should be interpreted against Reardon to mean communicated, but even if it means sold during LaSalle's tenure as an employee of Reardon, the property MOVA was not sold to Reardon. So again, in that aspect of interpretation, the PIAA just simply does not cover MOVA. Let me, with a few minutes, talk about the last issue you raised, which is unclean hands. We do think that the district court committed reversible error with respect to the doctrine of unclean hands. According to its explicit findings, Reardon acquired MOVA as a result of multiple intentional false representations by Mr. Perlman, but the district court ignored the resulting issue in its statement of decision. That was an error of law. When we raised the submission... But wouldn't you, under the district court's view of the case, wouldn't you be a co-fraudster? And so wouldn't you equally have unclean hands and can't come into court seeking relief? I don't believe so, Judge. My client is VGH. VGH is successor in interest to SHST, which purchased the property from original MO2. But you were on notice that, at the time, that there was a claim against this and therefore that this issue was out there. We were on notice that a claim had been made. That is not the same thing, notwithstanding what the district court said. That's not the same thing as knowing that the claim was valid. And especially relative to Mr. Perlman's unclean hand. The district court said that those unclean hands resulted in the agreement between OL2 and original MO2 saying nothing about Reardon. Saying, giving no indication that Reardon had any interest in BOVA. Now if you look at the record at I believe it's 1912, there's testimony as to the due diligence that SHST undertook with respect to its later purchase of the property. As part of that due diligence, it looked at that purchase and sale agreement. So Mr. Perlman's unclean hands extend well beyond the actual date of that OL2, original MO2 agreement. To later events where the purchaser relied on that being a full and complete purchase document. I'd like to save the rest of my time for rebuttal if I can. You may. You have about a minute and a half. Thank you, Your Honor. We'll now hear from Mr. Lohenfeld. Good morning, Your Honors. Can you hear me okay? Yes, it's a little bit echoey though. I don't know. Okay, I'm not hearing an echo and I'm on headphones so I shouldn't be getting any feedback. Do you want me to try something different? No, I think it will be sufficient. Thank you. Okay, thank you. Thank you, Your Honors. Michael von Lohenfeld for the appellees. May it please the court. This is a case about credibility. I'll try to focus directly on the questions the court asked, but the most important first point is a point that Judge Graber made. This issue as to whether the subsidiary finding is supported by any evidence was not raised in the opening brief. I just read you the portions of the opening brief that say it's not supported. I don't understand how you can say that. Well, the reason I can say that, Judge Collins, is that although there are sentences under a different argument, an argument about waiver of the PIIA that say it is not supported, there is no attempt by the appellant to do a clear error analysis. The appellant does not set forth all of the evidence in the record on this issue or explain why that evidence is not supported. It's not included in the issues presented. There is no notice of... Is it clear from the district court's ruling that he rested the finding that Reardon acquired MO2 as a subsidiary based on the PIIA? Because he says on page 15, LaSalle's actions in acquiring MOVA for MO2 were performed under his appointments agreement with Reardon. So it's a PIIA argument, which is why in the opening brief it's done as a PIIA argument. Your Honor, I don't think that's a fair characterization either of the appellant's burden or of the district court's order. Whether a company is a subsidiary is the same question as whether the company is owned by another company. Subsidiary is not a term of art. It just means that one is owned by the other. It's the factual question of who owned original MO2. Is there any objective paperwork in the record that shows that Reardon actually owned MO2? In any of the formal corporate paperwork setting it up, is there any that shows Reardon is the owner? No, Your Honor. There's no paperwork showing who the owner is at all because there's no such paperwork required for ownership of an LLC. So the paperwork, the formation paperwork, does not state that either Reardon or LaSalle were the owners. But the district court made factual findings based on credibility, listening to Mr. Perlman, listening to the CFO of Reardon, listening to Mr. LaSalle and citing Mr. LaSalle was lying, and also looking at Mr. LaSalle's assertive conduct throughout this period where he hid things, lied about things. How is it that Reardon has... that establishes that Reardon has ownership of this subsidiary? I mean, if it's not in the originating paperwork, it has to be in the employment agreement and the PIAA, which is what I read the order as saying. Where else does it come from? Well, so, Your Honor, that... First off, there is no law cited by anyone, certainly not appellant, that there has to be legal paperwork showing ownership. That issue was not raised below. It's not raised on appeal. And I don't believe there is any such law. The question was, when M02 was created, Reardon paid for it to be created. It was created by a Reardon employee acting under the instructions of his employer. The law presumes that that is the property of Reardon. Frankly, if Mr. LaSalle wanted to argue that it was his personal property, he is the one who should have had paperwork saying so. Now, that's consistent with the employment agreement and the PIAA, because this was part of LaSalle's job but to frame the question the way Your Honor just did, in asking where's the paperwork as if there is some paperwork that must be there, there's no record evidence that any such paperwork is even theoretically possible, much less required. So, your argument is that even if the employment agreement and the PIAA, by their terms, don't make this into Reardon subsidiary, that it still could be under some theory that doesn't rest on those documents? A general principle in the laws, we cited in the labor codes, that things that an employee does during his employment are for the benefit of the employer. Reardon paid for MO2 to be created using Reardon's lawyer, their normal lawyer, and Reardon paid for this transaction. So, all of the creations, all of the documents, so that now Mr. LaSalle said, well, it was just a gift to me. He had no paperwork showing that it was a gift. There was no sale document, no gift document. The court didn't believe him. This is a credibility issue. It's not a legal issue. And A, appellants didn't raise it, and B, the record is very clear. It's Mr. Perlman's testimony at SCR 281 and ER 1238-39, but also not cited by the appellant At trial transcript 824, 825, 1079, 1087, and 1089, there was clear testimony that the acquisition was being done and the subsidiary created for Reardon, not for Mr. LaSalle. That's the question. In order to find any other conclusion, this court would have to overturn the district court's credibility assessment. Even though you can't see the witnesses, you can't hear them, you don't have their body language, you would have to overturn basically every finding the court made about Mr. LaSalle's... But he also did find that this whole thing was structured as a fraud on Lauder. Well, that's actually, I think, a bit of an overstatement. He found that there were some misstatements to Lauder. The court also found expressly that Mr. Lauder was not harmed. He was not injured. That's at ER 62. So I would honor that I call it fraud. Damage is an element of fraud. He did say that if Lauder had known the true facts, he would have asked for a higher price or done more due diligence. And then probably gone forward with the transaction. What the court says is he might have. I think Your Honor made the excellent point earlier, Judge Collins, that both LaSalle and Perlman were found to have engaged in this conduct. So neither chain of title is clean. But if we're going to talk about unclean hands, unclean hands relates to the equitable conduct of the parties towards each other. It doesn't relate to unrelated parties like Mr. Lauder. And in fact, a case that the other side cited in its reply brief, the Carman versus Appian case, says at page 598, quote, a party may have relief in connection with a transaction itself untainted, although his original title may have been tainted by improper conduct. These principles are well settled. That's page 598 of the Carman case. Every case discussing this, the Adler case from this court, Matto, Brown versus Grimes, make it clear that unclean hands applies with respect to the party's conduct towards each other, not the party's conduct earlier or towards other people.  to support the assertion that Mr. Reardon, Mr. Perlman in any way injured the appellant in this case. And in fact, the court makes the exact opposite finding. As a factual matter, and based on the conclusion that appellant's own witnesses lied repeatedly in court, the court found that appellant knew that this was the property of Reardon, that MO2 was the property of Reardon, that the MOVA assets were the property of Reardon, and intentionally engaged in a shell game to take the assets for a fraction of what they'd been discussing before they learned that. If we take the district court's view that this was essentially a fraud between LaSalle and Perlman to get MOVA from Louder for a dollar, then what this looks like then is, well, now we have to enforce the contract between the fraudsters as to the allocation of the loot. And normally courts don't do that. That's what unclean hands bars. We leave things where they landed, and where they landed was that you structured it as a transaction where it was going to... MO2 is an independent entity, and so there it stays. Why is that not the right answer? Well, for a number of reasons, Your Honor. First, it misses an analytical step. When the MOVA assets went to MO2, that does not mean that LaSalle owned MO2, or that he had any right to then sell them away. The court found that MO2 was owned at all times by Riordan. That's a separate question from Riordan's acquisition of the assets from OL2. There are two transactions here. And the transaction from MO2 to SHST was unauthorized because MO2 was owned by Riordan, not LaSalle. That is the transaction that's important and that's at issue. I also, Your Honor, again, I have to take some exception to the use of the word fraud. The district court did not find a fraud or all of the elements of fraud. And that's just the characterization being put on it by the other side. And I would note that even if the contract were illegal, and there's no argument here that any of these contracts are actually illegal, the law is clear. You look at the Johnson v. Johnson case that we cited in our brief, the Jacobs v. Universal Development Court, that even where a contract is illegal and the parties are in pare delicto, you can still award relief against the party with the greater moral fault. And the district court made a clear finding, as he said himself at ER 15, that appellants are the party with the greater moral fault. So these are discretionary decisions. Is it impossible to go the other way? No. Of course the district court could have reached different conclusions, just like the district court could have made different conclusions as to credibility, could have made different conclusions as to what the facts were. But on appeal, we're not looking at whether there are different ways of viewing the issue. We're looking at whether the actual findings are supported by clear error. And they are not. And even on the abuse of discretion standard, you're still, as it relates to facts, looking for clear error. The appellant made no effort in its brief to fairly present the record against them, made no effort to actually describe all of the testimony against them, didn't even acknowledge the lies they told and the effect that that had on their case. This is not a case of clear error on any issue. Do you read the district court's order as relying on the agency theory that you've described, or does it rely on the employment agreement and the PIAA as the basis for saying that Reardon owned M02? The court cites the employment agreement and the PIAA, but of course that's all part and parcel of the employment. And the court refers repeatedly to the fact that LaSalle was a Reardon employee. So I don't think it's a reasonable interpretation to assume that the court was unaware of the baseline rules for how employment works. What I understand you to be saying is that even if he's wrong about how he read the words in the employment agreement and how he reads the words in the PIAA, that nonetheless, it would fall within an agency theory and therefore it would be owned by Reardon. But if the district court didn't rely on that theory but instead relied on a reading of these words that's not correct, does it have to go back? Well, I think, Your Honor, it's clear the district court made alternative findings. In fact, if you look at page 25 of the opening brief, the appellants themselves acknowledged that there were alternative findings. One was the fact that Reardon owned M02, and an alternative was under the PIAA. The appellant itself acknowledges at page 25 of its brief, just as they did below, that those are different theories, not the same theory. The fundamental question here, and it's not based just on the PIAA, it's based on all of the evidence about how M02 came about. The district court made a factual finding that he believed Steve Perlman when Steve Perlman said the intention was to buy this asset and create the subsidiary for Reardon, not for Mr. LaSalle. Unless the court is prepared without seeing any of the witnesses to overturn those credibility assessments, you must affirm this decision. It's not a question of sending it back because the court's analysis does not rest on, expressly, does not rest on any kind of contract interpretation. Now, I will say that the court's contract interpretation was correct. You don't need to reach it, and really there's no reason to, but it was correct. You know, the appellant, when they talk about this, they add this language during LaSalle's tenure. There's nothing in the PIAA that talks about LaSalle's tenure. In fact, it uses the opposite language. The PIAA says was or will be. So on the date that it's being signed, it relates to the property that was or will be developed, that was or will be acquired, the past and the future as of the date it was signed. In no way is it limited to whatever is happening during the tenure. So it would apply to something they developed years ago that's now owned by another company? If they reacquired it, yes. If it was reacquired. If they reacquired it. I mean, but that's covered by the phrase is conveyed to the company, but that's kind of the whole, we're back to that whole issue then. Well, then you're back to all of the credibility issues in the case. Look, this case comes down to two men saying opposite things. Chief Pearlman says this was intended for the company. LaSalle says, no, it wasn't. And the court looked at not only their demeanors and their language on the stand and believed Pearlman and his CFO Ivers and not LaSalle. In fact, he found in numerous places LaSalle was affirmatively lying to the court, as were other BGH witnesses. But more than that, he looked at LaSalle's conduct, his contemporary conduct at the time and found that it was wholly inconsistent with the belief he was doing the right thing and it was consistent with knowledge that he was doing something wrong. His furtive, stinking conduct and lies to his employer were wrong and they were not wrong. These were not the acts of a person who thought he had the right to do what he was doing. And all of the appellant's arguments where they say, well, you can infer this, you can infer that, those are not valid arguments on a clear air standard. This court is not a super jury. I mean, there's no jury here, but it's the same basic thing. You're not retrying the case on the paper. And I know you know that. So these are not legal questions. I do think, Your Honor, that I would ask just in terms of clarity in the law here, in terms of the appellant's burden, speaking some sentences in the middle of another argument does not adequately raise an issue of error. We were not on notice or I would have had a section in the answering brief discussing the subsidiary issue. The reason we don't have that is there was no such section in the opening brief. It's not a meaningless exercise. The reason that the appellant felt it necessary to include additional testimony in a further excerpt of record, and not even all the testimony, as I gave you earlier, there's some other sites that should have been included, was because they knew they hadn't raised this issue properly in their first brief, and they had not presented the evidence in their first brief. That's got to mean something. Otherwise, we should get us a reply and what are we doing here? It matters what issues they choose to pick to bring their appeal on. They chose certain issues. They should be stuck with the issues they chose to bring. But more importantly, really, than all of the appellate standards is the fact that this is fundamentally a question of intent, and it's admitted by both sides. There's no document that says original M02 is owned by A or B. There is no document. I have a hammer on my porch. My neighbor says I bought it for him or it's his hammer. I say it's my hammer. There's no document. There's no title to the hammer. You have a factual dispute as to who owns it. The court here, now this is not a hammer. It's larger than that. But the court made a factual assessment of the credibility of the witnesses and determined who really owned this property, who was intended to own it, who did own it, and found that at all times, M02 was owned by Riordan. That means the MOVA assets were owned by Riordan, not by LaSalle. You can only reverse that finding if you conclude that Mr. LaSalle was telling the truth and Mr. Perlman wasn't, which is the exact opposite of what you're supposed to do with the credibility finding on appeal. So we think the evidence is very clear, both that unclean hands was properly not applied, that the court exercised its discretion not to apply that doctrine, and that fundamentally M02, the original M02, was a property of Riordan, or if you want to use the word subsidiary, as the district court found, those findings are supported by the evidence and are certainly not clear error, and we'd ask the court to affirm. Thank you, counsel. Unless you have other questions. Thank you, your honors. Mr. Michelson, you have some rebuttal time remaining. Thank you, your honor. Let me make three points very quickly. It does not take a credibility determination as between Mr. Perlman and Mr. LaSalle to answer your question, Judge Collins, about what was the intent relative to original M02. We have lawyer Kalin's testimony, his written instructions to his staff in terms of the formation of original M02, and those instructions, when he was asked, whose is this? Who should I designate? His instructions were LaSalle for everything. That's as close as we get. The question comes down to agency. When he acquired MOVA for M02, and he signs all the paperwork for M02, was he acting as an agent of Reardon? That would seem to determine on a resolution of the credibility of the competing testimony, and that's been resolved. Why wouldn't you lose under an agency theory? I'll refer you to restatement of agency second, section 393, comment I believe, E, which says it's permissible. Not everything an employee does is for the benefit of the employer. It's permissible for an employee to acquire property that may even be competitive, maybe even be rival to his employer's business, so long as while the person is still an employee, he doesn't compete, and that describes the circumstances here. Mr. LaSalle never entered into competition. Now just very quickly, the third point I want to make is there's error on unclean hands. We believe that the district court applied unclean hands in the wrong way. First of all, it ignored it, but when it said it applied it, it refers to its statement of decision where it talks about equitable estoppel. Equitable estoppel is not unclean hands. These are different doctrines of different requirements, and it's error for the district court, even if it thought it was dealing with unclean hands, to have done so under the wrong standards. That's error. It's not a credibility issue. Thank you. We appreciate the arguments from both counsel, and the case just argued is submitted. We will take a five-minute break before our final case on this docket, which is U.S. v. Cervantes.
judges: Wallace, Graber, Collins